**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **JEMAINE MONTEIL CANNON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 99-CV-297-TCK-PJC** |
| | ) | |
| **RANDALL G. WORKMAN, Warden,** | ) | |
| **OKLAHOMA STATE PENITENTIARY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**REPORT AND RECOMMENDATION**
**TO SENIOR DISTRICT JUDGE TERENCE C. KERN**

**Dated:        January 15, 2013**
**United States Magistrate Judge Paul J. Cleary**

1

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 3 |
| II. | BACKGROUND | 5 |
| | A. PROCEDURAL HISTORY | 5 |
| | B. THE 1996 TRIAL | 6 |
| III. | PROCEEDINGS ON CANNON'S REMAINING CLAIM | 7 |
| IV. | FINDINGS OF FACT AND CONCLUSIONS OF LAW | 8 |
| | A. FINDINGS OF FACT | 9 |
| | (1) THE PREJUDICE PRONG | 9 |
| | a. The State's Evidence at the 1996 Trial | 9 |
| | b. Cannon's Testimony at the Evidentiary Hearing | 16 |
| | i. Direct Testimony | 17 |
| | ii. Inconsistencies in Cannon's Testimony | 21 |
| | iii. Cross-Examination Testimony | 24 |
| | (2) THE DENIAL PRONG | 29 |
| | (3) FINDING REGARDING CANNON'S CREDIBILITY | 34 |
| | (4) FINDING REGARDING SELF-DEFENSE | 36 |
| | (5) FINDING REGARDING MANSLAUGHTER | 37 |
| | B. CONCLUSIONS OF LAW | 39 |
| | 1. APPLICABLE LEGAL PRINCIPLES | 40 |
| | 2. ELEMENTS OF SELF-DEFENSE | 42 |
| | 3. ADMISSIBILITY OF PRIOR CONVICTION EVIDENCE | 44 |
| | a. Impeachment Value of Prior Conviction | 47 |
| | b. Time of Conviction | 48 |
| | c. Similarity of Offenses | 48 |
| | d. Importance of Cannon's Testimony | 48 |
| | e. Centrality of Credibility | 49 |
| V. | CONCLUSION | 51 |
| | OBJECTIONS | 52 |

# I.    INTRODUCTION

Petitioner Jemaine Cannon ("Cannon" or "Petitioner") killed Sharonda Clark ("Clark") in her Tulsa, Oklahoma, apartment on February 3, 1995.  Clark's death was caused by one or more stab wounds to her neck:  Two wounds to the carotid artery – one of which severed the artery in two – and one to the jugular vein.  A fourth knife wound, to the chest, hit Clark's sternum but did not strike any vital organ.  Cannon fled the scene, but was captured four days later in Flint, Michigan.  He was charged with murder, and tried in March 1996 ("the 1996 Trial").  The issue at his trial was whether Cannon had killed Clark with malice aforethought or in self-defense.  *Cannon v. State*, 1998 OK CR 28, 961 P.2d 838, 843 (Okla. Crim. App. 1998).  Manslaughter instructions were also submitted to the jury.  Cannon was convicted of murder and sentenced to death.  After exhausting his appeals, he then began the instant habeas corpus action.  Cannon's final ground for relief is his assertion that his lawyers denied him his right to testify at the 1996 Trial, and that, had he testified, it is substantially likely that the jury would have reached a different verdict.

This Report and Recommendation addresses the third and last of Cannon's claims under 28 U.S.C. § 2254.  The claims were remanded for further proceedings by the Tenth Circuit Court of Appeals in September 2004.[1]  *Cannon v. Mullin*, 383 F.3d 1152,

---

[1]    Two of the three issues have been resolved.  [*See* Dkt. No. 204, p. 44] (recommending a finding that, for purposes of procedural bar analysis, Cannon's trial and appellate counsel were not "separate"), *adopted* by the District Court on Dec. 6, 2007 [Dkt. No. 209]; [Dkt. No. 222, p. 12] (holding that Cannon had not been diligent in developing his ineffective assistance claim related to improper juror contact and that no further review of the claim was necessary)  [*Id.* at 12].

1157-58 (10th Cir. 2004), *cert. denied*, 544 U.S. 928 (2005).  Cannon's sole remaining claim asserts ineffective assistance of counsel by denial of Cannon's constitutional right to testify ("RTT") at his 1996 Trial.  The Tenth Circuit directed that an evidentiary hearing be held on Cannon's RTT claim, and the District Court referred the matter to the undersigned United States Magistrate Judge for Report and Recommendation.

On July 9-11, 2012 – 16 years after his murder conviction – Cannon took the witness stand before this Court at an Evidentiary Hearing ("the Evidentiary Hearing") on his remaining claim.  During his two days on the witness stand, Cannon detailed his claim that his trial attorneys prevented him from testifying in 1996, and offered the testimony he contends he would have provided at the 1996 Trial had he been allowed to take the stand.  Cannon's attorneys from the 1996 Trial, and Cannon's sister also testified.  Both Cannon and Respondent presented exhibits and briefs.  The Court has reviewed the transcript and exhibits from Cannon's 1996 Trial, *State v. Cannon*, Case No. CF-95-727 (Tulsa County District Court, Oklahoma), the entire record in this habeas corpus proceeding, the transcript of the Evidentiary Hearing,[2] briefs submitted by the parties, and the parties' proposed Findings of Fact and Conclusions of Law.  [Dkt. Nos. 292 & 293].  In addition, the Court has reviewed Oklahoma law to determine whether certain impeachment evidence would have been admissible against Cannon had he testified at the 1996 Trial.  This evidence included the fact of Cannon's 1991 conviction

---

[2]     This Report and Recommendation includes citations to the transcript of the 1996 Trial and to the Evidentiary Hearing held July 9-11, 2012. Citations to the 1996 Trial transcript will be designated "Trial, (page number), l. (line number)."  Citations to the Evidentiary Hearing transcript will be designated "Hrg., (page number, l. (line number(s)."

for Assault and Battery with Intent to Kill (the "1991 Conviction"), his 15-year prison sentence for the 1991 Conviction, and his escape from custody in 1995.  It also included evidence of another incident involving a girlfriend.

## II.     BACKGROUND

### A.  PROCEDURAL HISTORY

Following his 1996 conviction and death sentence, Cannon timely appealed to the Oklahoma Court of Criminal Appeals (the "OCCA"), which affirmed his conviction and sentence.  *Cannon v. State*, *supra*.  Cannon sought certiorari review from the United States Supreme Court; however, his request to proceed *in forma pauperis* was denied for failure to submit the required affidavit of indigence.  *Cannon v. Oklahoma*, 525 U.S. 1014 (1998).  Cannon also sought post-conviction relief in the OCCA.  The OCCA denied all requested relief in an unpublished order on April 19, 1999.

Shortly thereafter, Cannon initiated the instant federal habeas corpus action.  The District Court denied Cannon's Petition for Writ of Habeas Corpus on December 9, 2002 [Dkt. No. 81], and Cannon appealed.  In 2004, the Tenth Circuit affirmed the District Court's Judgment in all respects except with regard to the present RTT claim and two other issues, and the court remanded those three matters for further proceedings.  The Tenth Circuit held that under the circumstances presented herein, Cannon was entitled to an evidentiary hearing on his RTT claim.  *Mullin*, 383 F.3d at 1177.  Accordingly, the matter was remanded to the District Court with direction that the Court conduct an evidentiary hearing.

### B.  THE 1996 TRIAL

The 1996 Trial was conducted by Tulsa County District Judge Clifford Hopper,

and it began March 4 and concluded March 15, 1996.[3]  The State presented 13 witnesses

in the first stage (guilt/innocence) of the trial.  The defense called no witnesses; Cannon

did not testify.  The State called eight witnesses and the defense called four witnesses

during the second stage (punishment) of proceedings.

Cannon's trial lawyers were concerned that evidence of the 1991 Conviction, his escape

from custody, and a violent incident involving Cannon and a girlfriend named Pam

Salzman would be admitted if Cannon testified.   Pursuant to an understanding of the

parties[4], because Cannon did not testify at the 1996 Trial no evidence of Cannon's 1991

Conviction or of his escape was offered during the guilt/innocence stage.  However, the

evidence was admitted during the second stage of proceedings to establish aggravating

factors for the jury to consider in determining the appropriate punishment.

Since Cannon did not testify, the defense relied on a tape-recorded telephone

conversation from February 7, 1995 (shortly before Cannon's arrest), between Cannon

and Tulsa Police Detective Tom Fultz to provide the evidentiary basis for the self-

defense claim.[5]  Cannon's lawyers also asked Judge Hopper to instruct on

---

[3]      The guilt/innocence stage lasted from March 4 to March 12.  The punishment
stage began March 13 and ended on March 15.  Formal sentencing occurred on March
26, 1996.

[4]      This understanding, referred to as a "Gentlemen's Agreement," was the subject
of testimony at the Evidentiary Hearing.

[5]      This tape-recorded conversation is discussed in Part IV(A), *infra*.

manslaughter, as well as murder, although Cannon was adamantly opposed to the manslaughter instructions.

The jury convicted Cannon of murder in the first degree.  At the second stage, the jury heard evidence concerning the details of Cannon's violent beating of Awanna Simpkins that resulted in the 1991 Conviction, his 15-year sentence, and his escape from custody.  The jury also heard testimony regarding the violent incident involving Cannon and Pam Salzman.  Mitigation testimony concerned Cannon's troubled relationships with his step-fathers and physical abuse he suffered at their hands.  The jury found four aggravating circumstances and Cannon was sentenced to death.

### III.    PROCEEDINGS ON CANNON'S REMAINING CLAIM

This Court's assessment of Cannon's remaining claim is guided by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  Pursuant to *Strickland*, Cannon's claim that he was denied the RTT at the 1996 Trial is analyzed as an ineffective assistance of counsel claim.  There are two essential elements, or prongs, to this claim: (1) Counsel's performance was deficient in that counsel denied the defendant his RTT, and (2) the defense was prejudiced thereby.  *Strickland*, 466 U.S. at 687.  The two prongs may be addressed in any order; furthermore, the court need not address both prongs if the defendant makes an insufficient showing on one.  *Id.* at 697; *Nickel v. Hannigan*, 97 F.3d 403, 408 (10th Cir. 1996), *cert. denied*, 520 U.S. 1106 (1997).

At the Evidentiary Hearing, this Court received evidence related to the two specific *Strickland* prongs:  (1) Did Cannon's attorneys deny him his RTT at his trial? ("the Denial Prong") and (2) Was Cannon prejudiced by not testifying at his trial? ("the

7

Prejudice Prong").  For purposes of the Evidentiary Hearing, the Court admitted evidence related to Cannon's 1991 Conviction and his 1995 escape.  The Court made it clear, however, that admission of this evidence at the Evidentiary Hearing was *not* a determination by the Court as to whether any such evidence could have been admitted at the 1996 Trial.[6]

Four witnesses testified at the Evidentiary Hearing:  Trial Defense Attorneys Julia O'Connell and Sid Conway; Cannon, and his sister, Tamoura Cannon.[7]

## IV.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

Cannon testified at the Evidentiary Hearing for nearly six hours.  [Hrg., 223 to 426].  He stated that he demanded to testify at the 1996 Trial, but was denied that right by his trial attorneys.  Cannon then presented the testimony he said he would have offered had he been allowed to testify at the 1996 Trial.

The Court begins with its Findings as to the Prejudice Prong of the *Strickland* analysis because it believes this prong is dispositive of Cannon's claim.  This analysis requires that the Court consider "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.  Accordingly, the Court will start with a summary of the State's evidence presented at the 1996 Trial.  Next, the Court will summarize Cannon's testimony from the Evidentiary Hearing – the testimony Cannon contends he would have offered at the 1996 Trial.  Finally, the Court will assess Cannon's testimony, on direct examination and cross-examination, in light of the complete evidentiary record.

---

[6]     The Court's conclusions as to this question are set forth *infra* at Part IV(B).

[7]     The Court does not discuss herein Tamoura Cannon's testimony at the Evidentiary Hearing because it found her testimony to be neither useful nor reliable.

## A.  FINDINGS OF FACT[8]

### (1) THE PREJUDICE PRONG

#### (a) The State's Evidence at the 1996 Trial

The State called 13 witnesses in the guilt stage of the 1996 Trial.  The Court finds that the following key witnesses testified consistent with the summaries offered below.

#### Sheena Elliott (Trial, 682-702).

Sheena Elliott was Clark's neighbor at the Normandy Apartments where Clark was living with Cannon in February 1995.  Elliott testified that, following a job interview that morning, she stopped by Clark's apartment around noon on February 3, 1995.  She said that during this visit she got an uneasy feeling – as though she had interrupted an argument between Cannon and Clark – and so she left.  [Trial, 692, l. 7-16].  At approximately 5:30 p.m., Elliott called Clark's cell phone and Cannon answered.  Elliott asked to speak to Clark and Cannon told her Clark was not there.  However, Elliott could hear Clark in the background and asked to speak to her.  Elliott testified:

> He said, well, hold on and hung up the phone.  I called back, and got the message how it is whenever someone turns their cellular phone off.

[Trial, 693, l. 21-24].

---

[8]     Any Conclusion of Law which is more appropriately characterized as a Finding of Fact is incorporated herein.

### Agnes Clark [Trial, 704-725].

Agnes Clark was Sharonda Clark's mother-in-law.  She testified that around 5 p.m. on February 3, she learned that Sharonda had not picked her children up from the day care center.  The children were brought to Agnes Clark's apartment about 6:30 or 7 p.m. that night.  Agnes became increasingly worried about her daughter-in-law.  By the next day, her concern had reached the point that she telephoned Jacque Pepper, a friend of Sharonda's family, to get the family's phone number.  Agnes Clark also called the police to report Sharonda missing.

### Rashanika ("Rockie") Elliott [Trial, 726-736].

Rockie Elliott, Sheena's sister, lived in an apartment about four miles west of the apartment complex where her sister and Sharonda Clark lived.  She testified that between 5 and 6 p.m. on the night of Clark's death, she saw Cannon as she was walking home from a grocery store by her apartment.  Cannon helped carry her groceries to her apartment and spent the evening watching television with her family and friends.  Cannon slept on Elliott's couch that evening.   Rockie Elliott said that she saw no cuts, bruises, or injuries of any kind on Cannon.

### Adrian Michael Collins [Trial, 736-742].

Collins, a friend of Cannon's, testified that he saw Cannon at Rockie Elliott's apartment on February 4 and had a discussion with him "about his escape."  [Trial, 738, l. 21-24].  Collins took Cannon to the downtown Tulsa Greyhound bus station.

### Jacque Pepper [Trial, 712-726].

Concerned over Sharonda Clark's disappearance, on Saturday, February 4, 1995, Agnes Clark called Pepper to get the telephone number for Sharonda's family.  Pepper went over to Sharonda's apartment that evening, but there was no answer at the door.  She noticed an apartment window was broken.  She went to a movie with her daughter and afterwards called the police.  Pepper went back to Sharonda's apartment, arriving around 11 p.m. or midnight.  She was there when police arrived, unlocked the door with a pass key from security and found Clark's body.

### Tulsa Police Officer Vicki Smedley [Trial, 787-793].

Smedley arrived at Clark's apartment and called to have a security guard unlock the door.  Sheriff's Deputy Jeff Martin arrived with the key around 1 a.m., Sunday, February 5th.  They opened the door and found Clark's body.  Officers who also were at the scene included Detective Ken McCoy [Trial, 804-827], Tom Campbell [Trial, 828-848], and Det. Tom Fultz [Trial, 742-772].

### Dr. Robert Hemphill [Trial, 849-892].

Hemphill was a doctor employed by the Chief Medical Examiner for Oklahoma.  He testified that Clark's body was brought to his office early on February 5, and placed in refrigeration until he could conduct an autopsy later that day.  Hemphill established that Clark was 5 feet 5 inches tall and weighed 127 pounds.[9]  [Trial, 856, l. 15-16].

Hemphill described Clark's wounds and bruises.  He said that Clark suffered several stab wounds to the neck and chest, abrasions to the neck, and on the trunk and

---

[9]     Cannon was 6 feet 1 inch and 150 pounds.  [Hrg., 418, l. 8].

extremities.  He found "incised wounds of both hands." [Trial, 857, l. 14-15]. He also described several "defensive wounds" on Clark's hands caused as "if a person being attacked with a sharp instrument puts their hands up trying to ward the instrument off or trying to grab the instrument…" [Trial, 873, l. 2-6].

Hemphill's most significant findings were three stab wounds on the neck.  One wound entered about halfway down the neck, cutting from right to left into the area of the right common carotid artery.  [Trial, 861, l. 10-22].  This artery was cut completely in two either by this wound or by another with an entry point in the top front of the neck above the Adam's apple.  [Trial, 861, l. 23 to 862, l. 7].  This second wound went back into the same area of the right common carotid artery.  Hemphill stated:  "One of those stabs cut that artery completely into (sic)." [Trial, 862, l. 8].

A third wound entered the lower front part of the neck in the collar area and went straight back about five inches, partly cutting the jugular vein.  [Trial, 862, l. 9-17]. Hemphill stated that he believed Clark's death was a homicide caused by the stab wounds to her neck.  [Trial, 881, l. 10-18].  He testified that the damage to the carotid artery was the most serious injury because it is the major supplier of blood to the brain; however, the damage to the jugular vein could also have been fatal.  [Trial, 864, l. 16-18].

A fourth wound entered the mid-chest over the breast bone.  It struck the sternum and fractured the outer layer of bone.  The bone stopped the knife and it did not hit any vital organ.  [Trial, 865, l. 18 to 866, l. 2].  Hemphill could not determine which of the knife wounds was inflicted first.  [Trial, 863, l. 18-24].

Clark also had an assortment of cuts and bruises on her neck, chin, trunk and extremities.  Hemphill offered his opinion that Clark's death was a homicide and that she died between 23½ to 32½ hours before the initial examination of her body on February 5.[10]  [Trial, 883, l. 3-21].

### Betty Scott [Trial, 647-681].

Scott was Cannon's mother.  She said she learned of Clark's death on February 5, through a phone call to her daughter.  Later that day, Det. Tom Fultz came to Scott's apartment looking for Cannon.  The next morning, February 6, Cannon called Scott between 5:30 and 6 a.m.  Cannon said he had heard a news report and asked his mother, "Is she dead?"  [Trial, 656, l. 10-12].  Scott understood that her son was referring to Clark and confirmed her death.  She told him that Det. Fultz had been to her apartment looking for him.  Scott told Cannon she wanted him to call Det. Fultz and consider turning himself in.

Scott later received a phone call from her father in Flint, Michigan who told her Cannon was in Flint, staying at an uncle's house.  Scott relayed that information to Det. Fultz, giving him the address where Cannon was staying.  Scott had a second conversation with her son, perhaps the next day, and again urged him to turn himself in and talk to Det. Fultz.

Scott testified that Cannon had told her that while struggling with Clark over the knife, "she tripped and fell over a box and she was stabbed.  She fell on the knife."

---

[10]     This would put the time of death between 7 p.m. on February 3 and 4 a.m. on February 4.

[Trial, 671, l. 9-15].  Scott testified that Cannon told her that after Clark fell on the knife, she got up and kept coming at him.  [Trial, 676, l. 16-19].  Scott said that Cannon told her that at one point Clark "went to the kitchen for another knife."  [Trial, 676, l. 20-23].

### Tulsa Police Det. Tom Fultz [Trial, 742-772].

Fultz was the lead investigator in Clark's death.  He testified about the crime scene, the police investigation, witness interviews, and Cannon's arrest in Flint, Michigan.  Fultz testified that he requested an arrest warrant be issued for Cannon for first degree murder.  He said that he found no evidence to support Cannon's self-defense contention.  [Trial, 765, l. 24 to 766, l. 10].  Fultz also testified concerning the tape-recorded conversation that he had with Cannon on February 7, 1995.  A summary of that tape recording is set forth separately below.

### Flint, Michigan, Police Officer Terry Speedy [Trial, 773-784].

Speedy testified regarding Cannon's arrest in Flint on February 7, 1995.  Speedy said he saw no injuries anywhere on Cannon.  [Trial, 778, l. 11-13].

### The Taped Conversation Between Cannon and Det. Fultz

Cannon called Fultz on Tuesday, February 7.  Fultz recorded that conversation and an edited version of the tape recording was played to the jury at the 1996 Trial.[11]  In the conversation, Cannon admits stabbing Clark.  He says he was gathering his things to leave her, but she did not want him to go.  When he tried to leave, Cannon said Clark

---

[11]     The tape was edited to remove any references to Cannon's 1991 Conviction or his escape.  The transcript of the redacted tape was contained in Petitioner's Exh. 1, which was introduced at the Evidentiary Hearing.  The Court has also reviewed the unedited copy of the tape-recorded conversation.

"punched me and kicked me."  [Petitioner's Exh. 1 at Evidentiary Hearing ("Pet. Exh.1"), transcript of telephone conversation, p. 2].  He said that Clark "was throwing stuff at me and fighting me" [*Id.*], and that she threw something and broke a window. He said he did not know what she threw when she broke the window.  [*Id.*].  When Cannon tried to leave again, Clark "ran to the kitchen, got a knife and was coming at me."  [*Id.*].  He said he was getting his jacket near the apartment doorway when Clark attacked him with a knife.  "I turned back up, here she is running towards me with that…"  [*Id.* at 10].  Clark allegedly tried to stab Cannon.  "Then, we were fighting and struggling all over the house for the knife … when she came and was trying to stab me with the knife, that made me snap."  [*Id.* at 3].

Cannon said he feared Clark because she had told him that she and two other individuals had murdered a Tulsa couple named Matthews about five-and-a-half years earlier and had gotten away with it.  [*Id.* at 3 & 14].[12]

Cannon expressed concern that no one would believe his self-defense story. "Everyone thinks … is thinking the wrong deal when, you know, that she, she came at me, uh, uh, uh, me or, or our situation, but I don't expect anyone to believe that

---

[12]     Det. Fultz was asked if he tried to verify Cannon's story of the Matthews murder. He answered:

> Yes, sir, I did. His reference being that it was here in the Tulsa area.  I checked all our open homicides and/or any trials that may have occurred with the last name Matthews being as victims.  Also checked missing persons and within that 5 and ½ year period was not able to determine that we had anybody that fit that description.

[Trial, 763, l. 8-13].

though." [*Id.* at 5]. "Ain't nobody, ain't nobody gonna believe the truth. Everybody's out there thinking the wrong deal. Everybody…." [*Id.* at 8].

Cannon said the fight with Clark began in the living room and continued in the hallway and bedroom. [*Id.* at 9]. After the fight, he dragged Clark's body to the bathroom because "I panicked and drug her there." [*Id.* at 10]. Asked by Fultz why he dragged the body to the bathroom, Cannon said: "I don't know, just … I don't know." [*Id.*]. Cannon said he received a small cut on his left hand during the struggle with Clark. [*Id.* at 5].

Cannon said Clark was bleeding "the whole time we were fighting in, in the hallway and in the bedroom." [*Id.* at 13]. After he dragged the body to the bathroom, he changed his clothes [*Id.*] and left.

Cannon expressed concern that if he turned himself in, he would be locked up for the rest of his life. "They might… they could even be asking for the, for the, for the death penalty." [*Id.* at 16]. Cannon expressed concern over what Clark's neighbors might say about him. "[T]he only one that, that knows anything is the girl across the hall [Sheena Elliott], but that…(inaudible) she's crazy (inaudible) always fighting and arguing (inaudible), that's baloney, 'cause we never fought at night, and then when we fought, it was nothing big. Why's everybody lying?" [*Id.* at 19].

**(b) Cannon's Testimony at the Evidentiary Hearing**

The following is a summary of Cannon's testimony at the Evidentiary Hearing in July 2012.

16

*(i) Direct Testimony*

Cannon testified that on the morning of February 3, 1995, Clark had been angry at her neighbor, Sheena Elliott, because Elliott had come to Clark's apartment and asked to borrow money from Clark and/or Cannon.  Cannon said that Clark was still angry at Elliott over this incident when Elliott returned to the apartment later that day.  Cannon said that Elliott apparently misinterpreted Clark's anger as being directed at Cannon, when, in fact, it was directed at Elliott.  [Hrg., 286, l. 10 to 291, l. 16].

Cannon testified extensively about things he had heard from Clark and others that indicated to him that Clark had a propensity for violence.  [Hrg., 297, l. 9 to 305, l. 21].  Cannon also said that Clark kept a pocketknife under her side of the bed and that she told him she "wasn't afraid to use it."  [Hrg., 305, l. 16-21].  Cannon stated that because of this knowledge, he was anxious about Clark. [Hrg., 308, l. 23 to 309, l. 4].  He said he was afraid of her.  [Hrg., 310, l. 8-10].

Cannon testified that during the afternoon of February 3, Clark became angry with him because he would not respond to her questions.  [Hrg., 292, l. 16-22; 310, l. 3-7].  Unbeknownst to Clark, Cannon said, he was planning on moving out of her apartment and he was collecting his possessions for that purpose.  [Hrg., 292, l. 3-15].  According to Cannon, around 2:30 p.m., Clark realized that he intended to leave and a struggle ensued.  [Hrg., 312, l. 6-9].  As Cannon moved toward his jacket, which was lying on the floor near the apartment door, he said Clark ran in front of him, turned,

and stood blocking his path to the door.[13]  [Hrg., 314, l. 21 to 316, l. 9].  Cannon leaned

down to get his jacket.  He and Clark changed positions, so that now he had his back to

the apartment door and she was facing him.  [Hrg, 317, l. 4-23].  Cannon said Clark

asked where he was going.  [Hrg., 318, l. 4-6].  At some point Clark told him she loved

him and didn't want him to leave.  [Hrg., 293, l. 2-14].  He said she told him she was

pregnant and suggested he was the father.  [*Id.*].  Cannon said that when she asked why

he was leaving, he "kind of laughed at her."  [Hrg., 318, l. 8-10].  This incited Clark and

she started punching at him and kicking him.  [Hrg., 318, l. 11 to 319, l. 10].  Cannon

quickly grabbed both of Clark's wrists so that she could not punch him.

> She punched me and her blows connected, and I threw my hands up in
> front of me to reach out to grab her – her hands and arms.  I just reached
> out and I then grabbed her – her wrists to stop her from punching at me
> and….

[Hrg., 319, l. 6-10].

Cannon said that Clark jerked her hands back and, in doing so, struck herself in

the nose, causing a nose bleed.  [Hrg., 319, l. 11 to 320, l. 9].  Cannon told Clark, "Now

look, see what you've done."  [Hrg., 319, l. 24-25].  Clark backed off and Cannon walked

by her, heading south down the hallway to the master bedroom.  [Hrg., 320, l. 3-16].

Cannon went to the bedroom to get more of his belongings.  The light in the bedroom

was off; the only light came from a window on the south wall of the room.  [Hrg., 325, l.

---

[13]     Cannon said he was not moving toward the door to leave at this time because he
had not yet gathered all of his possessions.  He indicated that Clark may have thought
he was intending to leave.

15-20].[14]   Clark also entered the bedroom and moved to a position between Cannon and a closet on the west wall of the room.  [Hrg., 323, l. 12-16].  When Cannon bent down to pick something up, he felt an object go "whizzing by" his head.  [Hrg., 324, l. 15-20].  The object hit and broke the window.  Cannon saw the object was a jewelry box.  [Hrg., 328, l. 16-20].  This event scared Cannon, and he put his hands up to fend off Clark as she came towards him.  [Hrg., 329, l. 24 to 330, l. 5].  She stumbled, tripped and fell down with her head in the closet.  [Hrg., 330, l. 7-23].[15]  Cannon said this explained a blood stain found in the closet – that it was the result of blood from Clark's self-inflicted bloody nose, not from a stab wound caused by Cannon.  [Hrg., 332, l. 2-12].

Cannon said he turned again and walked out of the bedroom, leaving Clark where she had fallen in the closet.  [Hrg., 332, l. 21-25].  He walked down the hallway and into the living room where he paused and put his left foot on the coffee table in order to tie his shoe.  [Hrg., 333, l. 1-9].  His back was to the hallway.  [Hrg., 334, l. 11-15].  He said he heard a noise, looked to his left and saw Clark coming toward him with a kitchen knife.  [Hrg., 334, l. 21 to 335, l. 6].  Cannon said he swung up his left hand – thereby receiving a small cut on the top of his ring and middle fingers – and grabbed Clark's right wrist.  [Hrg., 335, l. 7-18].   He said she continued to try to stab at him with her right hand and also hit at him with her left hand.  [Hrg., 337, l. 7-18].

---

[14]      A diagram of the murder scene is contained in Petitioner's Exh. 5, No. 10.  These are exhibits from Cannon's 1996 Trial that were also introduced at the Evidentiary Hearing.

[15]      The apartment had clothing and other items pulled from closets and drawers because the complex had been sprayed that day for bugs.

Cannon said that he and Clark started moving down the hallway and back into the master bedroom while he was still holding her wrist.  [Hrg., 337, l. 19 to 338, l. 3].  At that point, Clark tripped over something on the floor and fell backward.  Cannon fell forward and when the two hit the ground, "the knife pop[ped] out."  [Hrg., 338, l. 4-16].  Cannon testified that Clark "lunged" for the knife and that he "dove" for the knife as well.  [Hrg., 338, l. 17-22].  Cannon said he recovered the knife and that he "swung it backwards blindly."  [Hrg., 338, l. 22-24].  He described his action as "blind, rapid swings of the knife."  [Hrg., 339, l. 15].  Cannon testified that because the light was off in the bedroom, "I [didn't] even realize if my swings [had] landed or not."  [Hrg., 339 at 5-6].  He continued swinging the knife until "it broke or it exploded."  [Hrg., 339, l. 9-10].

Cannon said he "snapped" when Clark first tried to stab him and when they both dove for the knife.  [Hrg., 340, l. 3-10].  Cannon said he feared for his life.  [Hrg., 340, l. 17-22].  He estimated that the whole incident – from the first confrontation in the living room until Clark was lying in the bedroom stabbed – took "half a minute or less."  [Hrg., 341, l. 18-23].

After the knife broke and the struggle in the bedroom was over, Cannon dragged Clark's body across the hall to the bathroom.

> After – after the knife had broken, there was – I saw Sharonda there and I wanted to help her, and the first thing I thought about was the bathroom as there would be some medical supplies in the bathroom.  I reached to grab Sharonda and couldn't pick her up so I pulled her from where she was to the bathroom.

[Hrg., 342, l. 3-9].

Cannon testified that when he saw Clark in the light of the bathroom, he realized

her condition was "much worse than what I expected to see." [Hrg., 342, l. 11-17]. He

said that when he saw her condition he did not believe he could render any aid:

> At that point when I seen that in the light, I did not believe there was anything I could do. At that point when I didn't believe there was anything I could do, I left out of the bathroom.
>
> Q. And then what?
>
> A. When I left out of the bathroom, I – I got some clothes and I changed clothes and I got some of the stuff that I had been getting together and I gathered – I gathered the items and I left.

[Hrg., 342, l. 25 to 343, l. 8].[16]

### (ii) Inconsistencies in Cannon's Testimony

Cannon's testimony at the Evidentiary Hearing was frequently inconsistent with

other evidence.

- **Clark's nose bleed.** Cannon did not tell Fultz that Clark hit herself and started a nose bleed, as he testified at the Evidentiary Hearing. *Compare* [Petitioner's Ex. 1 with Hrg., 319, l. 21 to 320, l. 6]. Fultz asked Cannon why there was so much blood in the closet of the master bedroom. Cannon told Fultz that he and Clark had been fighting and she had fallen into the closet. He did not mention to Fultz that Clark's bloody nose was the source of the blood in the closet; however, when he testified at the Evidentiary Hearing, Cannon attributed the blood in the closet to Clark's nose bleed. [Hrg., 331, l. 25 to 332, l. 16] .

---

[16]     Evidence from the 1996 Trial and the 2012 Evidentiary Hearing establish that Cannon did not call anyone for help. After he left Clark's apartment, he ran into Rockie Elliott – Sheena Elliott's sister – near a market at 63rd Street and Peoria Avenue in Tulsa. He helped Elliott carry her groceries back to her apartment and spent the evening there, sleeping on the couch. The next day, Cannon had a friend drop him off at the Greyhound bus station in downtown Tulsa so he could escape. Cannon made his way to Flint, Michigan, where he stayed with relatives. He was arrested by Flint Police on February 7, 1995.

- **Cannon's testimony regarding Clark's knife.**  Cannon told Fultz that Clark went to the kitchen to get the knife she used to attack him.  [Petitioner's Ex. 1, p. 2]  But at the Evidentiary Hearing, Cannon said Clark told him her "choice of weapon" was a knife she kept under her side of the bed.

    > She told me about a knife that she kept under her bed, and she told me that that was her choice of weapon.  She told me that – she told me that she was – she basically told me that she wasn't afraid to use it, that was her choice of weapon, she wasn't afraid to use it.

    [Hrg., 305, l. 16-21].

    Cannon pointed out the knife lying on the mattress in a police photo taken at the crime scene in 1995.  [Hrg., 308, l. 17-22; State's Ex. 27].  Thus, while Clark's "choice of weapon" was readily available to her in the bedroom where she had fallen, his testimony was that she chose to go to the kitchen for a different knife.  This also differs from what Cannon told his mother – that Clark attacked him with a kitchen knife and that during their struggle Clark "went to the kitchen for another knife."  [Trial, 675, l. 8-9; 676, l. 20-23].

- **Cannon's testimony regarding the object Clark threw at him.**  Cannon told Det. Fultz that Clark threw something at him while he was gathering his possessions from the bedroom.  He told Fultz he did not know what the object was.  [Petitioner's Ex. 1, p. 2].  At the Evidentiary Hearing, Cannon testified that Clark threw a jewelry box at him.  [Hrg., 328, l. 13-20].  Furthermore, Cannon testified that he was bending down to get something out of the bedroom dresser when Clark threw an object at him that "went whizzing by my head and hit the window."  [Hrg., 324, l. 14-20].  He testified that after the object went by his head while he was bent down, it "hits the top part of the window and it breaks the window."  [Hrg., 326, l. 25 to 327, l. 9].  It is not credible that a thrown object went "whizzing by" Cannon's head as he was bent over, but hit and broke the top part of the window.

- **Differing accounts of when Clark attacked him.**  Cannon told Fultz that Clark attacked him with a knife when he was getting his jacket.  [Petitioner's Ex. 1, p. 10].  At the Evidentiary Hearing, Cannon said he was attacked while he was tying his shoe.  [Hrg., 334, l. 21 to 335, l. 13].

- **Cannon gave inconsistent reasons for dragging Clark's body to the bathroom.**  Cannon told Fultz he dragged Clark into the bathroom because he "panicked."

    > Fultz:  O.K.  How'd she get from the bedroom to the bathroom?

> Cannon:  Uh, I drug her there.  I panicked and drug her there.
>
> Fultz:  O.K.  What… why would … why'd you do that?  Just….
>
> Cannon:  I don't know, just ... I don't know.... I panicked, didn't know what to do.  I wasn't thinking straight.

[Petitioner's Ex. 1, p. 10].

However, at the Evidentiary Hearing Cannon said he dragged Clark to the bathroom because he "wanted to help her."  [Hrg., 342, l. 3-5].

> [T]he first thing I thought about was the bathroom as there would be some medical supplies in the bathroom.

[Hrg., 342, l. 5-9].

- **There is no evidence to support the Matthews' murder story.**  Cannon told Fultz and testified at the Evidentiary Hearing that Clark said she had been involved in a double homicide in Tulsa about five-and-a-half years earlier.  He said the murdered couple was named "Matthews.  I think she said Brenda and Jason or something.  Their last name was Matthews."  [Petitioner's Ex. 1, p. 3 & 14-15].  Fultz' subsequent check of Tulsa Police records turned up no information for a homicide as Cannon described.  [Trial, 763, l. 2-13].

- **Cannon's cut hand.**  Cannon told Fultz and testified at the hearing that he suffered a cut to the top of his left hand during the struggle with Clark. [Petitioner's Ex. 1, p. 5; Hrg., 335, l. 7- 13].  Rockie Elliott recalled no injuries or cuts to Cannon when she saw him later on the night of the killing  [Trial, 730, l. 6-16], and  Flint Police Officer Speedy saw no cuts on Cannon when he  arrested him in Michigan on February 7, 1995.  [Trial, 778, l. 8-13].

- **Cannon's fear of Clark.**  Cannon told Fultz and testified that he was scared of Clark because of her propensity for violence and her willingness to use a knife [Petitioner's Ex. 1, p. 3-4; Hrg. 297, l. 9 to 309, l. 4]; yet, despite this fear, Cannon continued to live with Clark.  [Hrg., 398, l. 7-12].  Cannon said Clark had told him she had participated in a murder and "gotten away with it."  [Pet. Exh. 1 at 3].  Cannon told Det. Fultz Clark told him of this murder "like a week or two ago."  [Pet. Exh. 1 at 4].  In spite of this, Cannon continued to live with Clark.  In addition, on multiple occasions during the fight with Clark, Cannon turned his back to her – even stopping to tie his shoe in the living room, when he knew that she had her "choice of weapon" in the bedroom behind him.  [Hr., 305, l. 16-21].

23

Cannon also passed up multiple opportunities to escape from Clark.  [Hrg., 403, l. 7-20; 404, l. 2-13].

- **Cannon's description of the killing.**  Cannon testified that as he and Clark struggled down the hallway to the bedroom, Clark tripped and fell backward into the room and he fell forward toward her.  [Hrg., 338, l. 4-16].  The knife dropped from Clark's hand and both Clark and Cannon grabbed for it.  [*Id.*, l. 17-24].  Cannon said he grabbed the knife with his right hand.  [Hrg., 411, l. 22-24].  This would have been extremely difficult given that, by his own account, Cannon was lying on his right side with his back toward the north wall in the bedroom and his head facing the south wall with the window.  [Hrg., 412, l. 11 to 413, l. 2].  Cannon says he swung the knife "backwards blindly."  [Hrg., 338, l. 22-24].  It is not credible that Cannon's blind swings with the knife resulted in four precise wounds as described by Dr. Hemphill [Trial, 861, l. 10 to 866, l. 2]:  Cannon slashed Clark's right carotid artery twice, her jugular vein once, and likely would have stabbed her in the heart had the knife not struck the sternum.

- **Betty Scott's testimony.**  Cannon's testimony was also inconsistent with what his mother had testified to at his trial.  Scott testified that her son told her that while he and Clark were struggling for the knife, Clark tripped over a box and fell on the knife.  [Trial, 671, l. 12-15 and l. 21].  Cannon did not mention this to Det. Fultz, nor did he testify at the Evidentiary Hearing that Clark fell on her knife.  Cannon's statement to his mother that Clark attacked him with one knife but later went to the kitchen to get a second knife [Trial, 676, l. 20-23], is also inconsistent with what he told Det. Fultz and with his testimony at the Evidentiary Hearing.

### (iii)    *Cross-Examination Testimony*

The State's cross-examination of Cannon at the Evidentiary Hearing destroyed his credibility.  While he had generally appeared calm and forthcoming during direct examination with very detailed memory of events, he quickly became defensive, evasive, and forgetful during cross-examination.  On direct testimony, Cannon had demonstrated an ability to remember details of conversations and the time when they occurred.  On cross-examination, however, Cannon's ability to recall disappeared.  He was unable to remember his testimony from the previous day, chose not to recall it, or

simply became uncooperative.  He repeatedly refused to acknowledge his earlier

testimony or statements and deferred to "the record" instead.  Below are examples of

Cannon's evasiveness in response to the State's questions.  (The questions have been

paraphrased for simplicity.)

- You didn't tell Det. Fultz about Clark's nose bleed, did you?
  "The record speaks for what I said to Detective Fultz.  If it's not there, the
  record's not there."  [Hrg., 394, l. 16-17].

- You told Fultz you were attacked while going for your jacket, not while
  tying your shoes.
  "If that's what the record says, that's what the record says."  [Hrg., 395, l.
  8-9].

- You told Fultz you dragged Clark to the bathroom because you
  "panicked," not because you wanted to render medical aid.
  "If that's what the record says, yes."  [Hrg., 396, l. 9].

- You said nothing to Fultz about wanting to render Clark medical aid, did
  you?
  "I don't disagree with what the record says."  [Hrg., 396, l. 13].

- You testified (yesterday) that on the day of her death, Clark asked you
  questions but you would not answer her, didn't you?
  "If that's what the record from yesterday reflects, that's what I said."
  [Hrg., 399, l. 1-2].

- You testified that at one point you laughed at Clark, didn't you?
  "If that's what the record reflects, that's what I said."  [Hrg., 399, l. 7-8].

- You testified that the fight with Clark started because you wanted to
  leave, correct?
  "If that's what the record says I said, that's what I said."  [Hrg., 399, l. 19-
  20].

- You testified that you were holding Clark's hands, and she pulled them
  back and hit herself, causing a nose bleed, correct?
  "If that's what the record says I said."  [Hrg., 400, l. 20].

- How did you describe the knife Clark kept by her side of the bed?
  "Whatever the record says I described it, I'll leave it at that."  [Hrg., 401, l. 14-15].

- You testified that Clark fell into the closet and her nose bled on the floor, correct?
  "I didn't testify to the words in the way you're stating it.  The record will reflect the way I testified, and I agree with the record that I testified to."  [Hrg., 403, l. 3-6].

- You told Det. Fultz all you were trying to do was leave Clark's apartment, right?
  "If that's what the record says."  [Hrg., 404, l. 22].

- Didn't you tell Det. Fultz six times that you were trying to leave Clark's apartment when the fight ensued?
  "If that's what the record says."  [Hrg., 404, l. 24].

While Cannon remembered minute details during his direct examination, on cross-examination, his memory failed him:

- Did you tell Det. Fultz why you fled the state?
  "I don't recall."  [Hrg., 405, l. 24].

- Did you tell Fultz you fled because of your prior criminal history?
  "I don't recall."  [Hrg., 406, l. 3].

- You stabbed Clark in the chest, correct?
  "I don't recall."  [Hrg., 408, l. 8].

- Didn't you testify earlier that after Clark dropped the knife you dove for it?
  "I don't recall."  [Hrg., 409, l. 7].

- Did you feel the knife enter Clark's body the first time you swung it?
  "I don't recall feeling it."  [Hrg., 414, l. 9].

- Did you feel the knife enter Clark's body the second time?
  "I don't recall feeling the knife enter her body at any time.  I don't recall."  [Hrg., 414, l. 15-16].

- You didn't feel any resistance every time you swung the knife around?

26

"I said I don't recall feeling any – I didn't say I didn't feel.  I said I don't recall feeling any resistance."  [Hrg., 414, l. 19-21].

- So, you may have felt resistance, you just don't recall?
"I'm saying that I don't recall."  [Hrg., 414, l. 25].

- You don't recall feeling any resistance when the knife was plunged into Clark's neck five inches deep?
"I have no specific recollection of feeling."  [Hrg., 415, l. 4].

Cannon was unable, even 17 years after Clark's death, to admit he had stabbed her.

> Q. *(BY MS. DICKSON)* Mr. Cannon, you took the knife that was found at the scene and you plunged it into Mrs. Clark's chest, did you not?
>
> A. Sharonda was stabbed with the knife that was at the scene.
>
> Q. And you plunged it into her chest; correct?
>
> A. I don't recall.

[Hrg., 408, l. 2-8].

Cannon stated on direct examination that he dragged Clark's body to the bathroom because there were medical supplies there and he wanted to help her.  But on cross-examination, Cannon admitted that after he saw how severely Clark was injured, he did not call for medical assistance.  He simply left her body in the bathroom while he changed out of his bloody clothes, gathered his possessions, and fled.  [Hrg., 342, l. 25 to 343, l. 8].

Cannon consistently expressed great fear of Clark.  For example, he told Det. Fultz that he was afraid to go to sleep around her "knowing what I know she's capable

of." [Pet. Exh. 1, p. 3]. On direct examination at the Evidentiary hearing, Cannon

testified that he was scared of Clark because of what she and others had told him about

her propensity for violence. On cross-examination, however, Cannon admitted that

despite his fear he continued to live with her. [Hrg., 398, l. 7-12]. Furthermore, while

on direct examination he testified that after his fight with Clark began, he feared for his

life, he admitted on cross-examination that he passed up several opportunities to escape

from her.

> Q. Do you agree that she was at some point while
> you were in the bedroom with her, prior to getting
> the knife, laying on the floor in the closet?
>
> A. Correct.
>
> Q. Okay. And you didn't leave, did you?
>
> A. No.
>
> Q. Now, you also testified yesterday that she
> threw an object at you, a jewelry box?
>
> A. Yes.
>
> Q. Okay. And you testified that that scared you;
> correct?
>
> A. Yes.
>
> Q. Okay. And you still didn't leave, did you?
>
> A. No.
>
> Q. As a matter of fact, you were so scared that as
> you walked down the hall, you stopped to tie your
> shoe; is that correct?
>
> A. Stopping to tie my shoe had nothing to do with

being so scared. Scared doesn't make me tie my shoe.

Q. If you're scared of Ms. Clark, would you not want to be out of her presence?

A. I was out of her presence at that moment.

Q. Because she was down in the closet; correct?

A. At that moment, I don't know where she was at.

Q. You still didn't try to leave, did you?

A. I did not leave at that point.

Q. With all the opportunities that you had to leave, you didn't leave until after you killed her, did you?

A. I did not leave until after.

Q. Until after you killed her; correct?

A. Was she killed at that point? I don't -- I didn't leave until after.

Q. Until after you stabbed her; correct?

A. I left after -- after -- after she had been stabbed.

[Hrg., 403, l. 7 to 404, l. 19].

### (2) THE DENIAL PRONG

Cannon's lack of credibility is fatal to his entire case.  His testimony at the

Evidentiary Hearing as to the events of February 3, 1995, was replete with

inconsistencies.  His memory was too convenient:  Cannon offered very detailed

29

recollections when it suited his cause, but suffered extensive memory lapses when his testimony was tested.  The Court believes that its detailed findings with respect to the prejudice prong are sufficient to resolve Cannon's RTT claim without even addressing the Denial Prong.  *Strickland*, 466 U.S. at 697.  Nevertheless, because so much time and money has been invested in these proceedings, the Court will briefly address the Denial Prong, highlighting additional credibility issues with respect to Cannon's assertion that he demanded, and expected, to testify at the 1996 Trial.

At the Evidentiary Hearing, Cannon was adamant that his trial attorneys had been disdainful of him and cared little about his case.  [Hrg., 364, l. 15 to 365, l. 15].  On cross-examination, however, Cannon acknowledged two letters that contradicted this testimony.  The letters – one to O'Connell and one to Conway – were written while Cannon's trial was underway.  In the letter to Conway, Cannon stated:

> However this ordeal turns out I feel I have a debt to you that couldn't be met with any amount of money or earthly richness.  You have come to help me when no one else would and even when you didn't have to.  You have demonstrated human compassion, concern, care, and understanding that I never expected from you.  You've gone that extra mile for me and really put yourself in a special light to me.  The fire in your heart and mental toughness of your mind really set you apart from the crowd.

[Respondent's Ex. 13; Hrg., 374, l. 11-20].

To O'Connell, Cannon wrote:

> I know you have put a lot of time and effort into me and it's probably spilled over into your personal time.  I want you to know I really am thankful and appreciative of the efforts and sacrifices you have made on my behalf even though I haven't shown it....  You came to my aid when you had no obligation to.  You've shown concern, care, and devotion beyond the call of duty.

[Respondent's Ex. 14; Hrg., 376, l. 4-17].

After acknowledging these letters, Cannon denied they reflected his true feelings about his lawyers.  On re-direct, he testified the letters were his "finesse technique" to get his attorneys to be receptive to his desire to testify.  [Hrg., 419, l. 4-5].  The Court finds Cannon's explanation not credible.  The Court believes that the letters accurately reflect Cannon's gratitude for his attorneys' efforts in a very difficult trial.

In addition, Cannon testified that before jury voir dire began in his case, he told Conway again that he wanted to testify.  He indicated that Conway told him that Judge Hopper had assigned her to the case, and that she was the "captain of the ship," and that she would make all decisions concerning the case.  [Hrg., 231, l. 12-21].  Cannon said that Conway told him that he was not going to testify because the witness list had already been submitted and his name was not on it.  [Hrg., 231, l. 15-21].  However, in 1998, he sent O'Connell a letter and a proposed affidavit attributing the "Judge Hopper assigned me" comment to her, not Conway, and asking O'Connell to acknowledge that *she* had denied him his right to testify.[17]  [Respondent's Ex. 1, ¶ 1].

---

[17]    Cannon's proposed affidavit for O'Connell's signature addressed two issues: First, that counsel had requested a manslaughter instruction even though Cannon objected to it, and second, that O'Connell had prevented him from testifying at trial. O'Connell wrote Cannon that she was willing to sign an affidavit as to the manslaughter issue but not that she had prevented him from testifying:  "I cannot swear out an affidavit claiming that I would not let you testify, because I never told you that you couldn't testify and I don't recall you telling me that you wanted to testify."  [Nov. 19. 1998 Letter and proposed affidavit from Julia O'Connell to Cannon, Respondent's Exh. 2].

Furthermore, although Cannon stated at the Evidentiary Hearing that he expected to testify at his trial, other evidence discredits his testimony.  During jury selection at the 1996 Trial, Cannon exchanged notes with his attorneys about prospective jurors.  With respect to one juror, Cannon wrote:

> This guy is okay for 1st stage but in 2nd stage he will kill me.  He has daughters.  He will assimilate (sic) with the victim and Pam and Awanna plus his wife was a victim.

[Respondent's Ex. 12, p. 3].

Although Cannon denied it, the clear implication of this notation is that Cannon believed the juror would be good for the defense in the guilt phase, because Cannon would not be testifying and, therefore, his prior record would not come out.  But the notes indicate that Cannon realized that the juror would be problematic in the second stage, when evidence would be admitted about Cannon's previous conviction.  This establishes that Cannon understood that he would not testify in the guilt phase of the trial.

Cannon also stated that he believed he was going to testify after the Government rested.  He testified that he fixed his jacket and started to stand up to take the witness stand [Hrg., 387, l. 7-14], but that his lawyers quickly rested to prevent him from doing so.  In further contrast to his testimony, his attorneys had made it clear from the start of the 1996 Trial they were not going to call *any* witnesses.  In her opening statement to the jury, O'Connell stated:

> When all is said and done and everyone has come in here to testify, <u>the defense will not call witnesses.</u>  That's because the witnesses that we would use have already testified.  I will have talked to them in cross

examination.  The same witnesses the State relies on are the witnesses that
the defendant relies on.

[Trial 642, l. 18-23 (emphasis added)].

Furthermore, Cannon must have known that he would not be testifying when he
reviewed the proposed jury instructions.  Defendant's Requested Instruction No. 2
concerned Cannon's right *not* to take the witness stand:

> The defendant is not compelled to testify, and the fact that a defendant
> does not testify cannot be used as an inference of guilt and should not
> prejudice him in any way.
> You must not permit that fact to weigh in the slightest degree against the
> defendant, nor should this fact enter into your discussions or deliberations
> in any manner.

*State v. Jemaine Cannon*, CF-95-727.

Finally, there is no record of any effort by Cannon to testify at trial.  Cannon was

asked why he didn't ask to speak to the court or speak up once the jury was out of the

courtroom at a break.  He said he had been told the judge would not listen to him and

that had he stood up to say anything, "I would have [been] beaten down, shot, tased by

the sheriff's deputies that were – that were present there."  [Hrg., 424, l. 4-7].  He said he

was told that the judge would only speak to the lawyers.  [Hrg., 424, l. 8-14].  Given that

Cannon was on trial for his life, and how adamantly he sought to be involved in the

case, it is not credible that he would have remained quietly submissive if he expected to

testify.

The Court finds reliable the testimony of O'Connell and Conway as to their

general practice to advise a client of his/her right to testify at trial.  The Court finds that

there was an understanding on the defense side that Cannon would not testify in order

to preclude use of his prior conviction against him and because he would have been an

"awful" witness. [Hrg., 67, l. 21-23]. The Court does not find Cannon's testimony reliable, particularly after witnessing first-hand his sudden lapses of memory during cross-examination. Furthermore, Cannon's written notes to his attorney during voir dire and counsel's opening statement that the defense would call no witnesses belie Cannon's testimony. Thus, the Court does not believe Cannon's testimony that he was denied the right to testify at trial.

### (3) FINDING REGARDING CANNON'S CREDIBILITY

The Court has reviewed all of the evidence herein and finds that Cannon was not a credible witness. This conclusion informs the Court's determination of both the Prejudice Prong and the Denial Prong of the *Strickland* analysis.

As to the Prejudice Prong of the *Strickland* test, the Court finds that Cannon's defense was not prejudiced by his failure to testify at the 1996 Trial because his testimony was so untrustworthy and so inconsistent with other credible evidence that it is not substantially likely his testimony would have changed the trial result. Cannon's inability to handle cross-examination – his evasive and uncooperative demeanor – would have rendered him a wholly ineffective witness. His account of Clark's death strains credulity beyond reasonable limit. Cannon contends he killed Clark because he was in fear for his life. But Cannon was far bigger than Clark – eight inches taller and at last 20 pounds heavier. By his own account, twice within 30 seconds Cannon easily neutralized Clark's attacks on him. He claimed that for several weeks before her death he was afraid of Clark, yet he continued to stay at her apartment. On several occasions during the events of February 3, 1995, Cannon had the opportunity to escape from

Clark's apartment; nevertheless, despite his great fear of her, he remained.  When

Cannon gained control of the knife during his struggle with Clark, he swung the knife

"blindly" yet managed to stab his victim in four precise locations likely to cause death.

After the knife "exploded" from stabbing Clark, Cannon's first thought was to drag

Clark to the bathroom "as there would be some medical supplies" there.  But once

Cannon saw how badly wounded Clark was, he made no effort to render aid of any

kind and did not call for help.  Instead, he changed clothes, gathered his possessions

and fled.  Cannon's story is simply not credible, and coupled with the inconsistencies in

his own statements, the conflict between his testimony and that of other witnesses and

his poor performance when cross-examined, Cannon revealed himself to be a wholly

untrustworthy and unsympathetic witness.

Likewise, with respect to the Denial Prong, the Court has assessed the testimony

and credibility of the key witnesses:  Julia O'Connell, Sid Conway, and Jemaine

Cannon.  Again, the Court finds that Cannon is not a credible witness.  The Court's

finding in this regard is based not just on Cannon's testimony with regard to whether

he was denied the right to testify by his lawyers, but also his overall lack of credibility

as reflected by his testimony during cross-examination about the events of February 3-5,

1995.  While O'Connell and Conway could not recall specifics of their conversations

with Cannon 16 years ago, both stated that in their customary practice as criminal

defense lawyers, they would advise clients of their right to testify and would never

prevent a client from testifying if that is what he/she wanted to do.  Cannon, on the

other hand, had a detailed recollection of meetings and events – until cross-examined.

During cross-examination Cannon was suddenly forgetful, and uncooperative.  The result was that Cannon's direct testimony seemed carefully rehearsed while during cross-examination he became fearful of answering even simple questions.   The Court finds O'Connell and Conway to have been credible witnesses as to their general practice with respect to clients who wished to testify.  The Court did not believe Cannon.  Thus, the Court finds that Cannon was not denied his right to testify at the 1996 Trial.

### (4) FINDING REGARDING SELF-DEFENSE

After hearing Cannon's testimony and observing his demeanor as a witness, the Court finds that Cannon's testimony did not establish a reasonable probability that had he testified at the 1996 Trial the jury would have found he acted in self-defense.  As the Court has described in detail above, Cannon's testimony was inconsistent with statements he made to Det. Fultz and to his mother about the circumstances of Clark's homicide.  Furthermore, by his own testimony Cannon had several opportunities to escape from Clark's apartment, but did not take advantage of them.  In addition, Cannon was much larger than Clark and quickly neutralized her attacks on him.  He grabbed both of Clark's wrists when she was punching him and grabbed her right wrist when Cannon says she tried to stab him.

According to Cannon's testimony at the Evidentiary Hearing, Clark's death seemed accidental.  Cannon described swinging a knife "blindly" – making the wounds to Clark's carotid artery and jugular vein appear to be almost happenstance.

Cannon's credibility was critical to his self-defense argument.  As described above, Cannon's performance during cross-examination shredded his credibility and undermined his entire testimony.

**(5) FINDING REGARDING MANSLAUGHTER**

The Tenth Circuit Court of Appeals' 2004 decision suggested that had Cannon testified at his 1996 Trial, he might have influenced the jury to reach a different verdict, convicting him of manslaughter, rather than murder.  Cannon did not want manslaughter submitted to the jury.  Based on Cannon's demeanor and testimony at the Evidentiary Hearing – especially his performance under cross-examination – the Court finds that Cannon's testimony did not create a substantial probability that the jury would have reached a different result and convicted on manslaughter.

Oklahoma law provides that homicide is manslaughter in the first degree when "perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."  21 Okl.St.Ann. § 711.  At the 1996 Trial, the tape-recorded telephone conversation between Cannon and Fultz was played to the jury.  In that conversation, Cannon said that when Clark came at him with the knife "that made me snap."  [Pet. Ex. 1 at 3].  When Det. Fultz asked what he meant by that, Cannon explained:

> It was like too much … I was already stressed out because of the situation I was in, and you guys are putting the heat down pretty tough … and I couldn't get my head together then, 'cause I was already on the edge and everything.  Then when she come … and like I was, I was already scared of her 'cause she told me about a murder that her and two of her friends

done, she said, and they had gotten away with it.  They … she said they done it five and a half years ago.  They murdered a couple there in Tulsa.

[Pet. Ex. 1 at 3].[18]

Later, Cannon told Fultz, "when someone comes at you with a weapon … you're not thinking straight at all."  [Pet. Ex. 1 at 12].

Fultz:  Yeah, I hear you.  So you just kinda, kinda lost control?

Cannon:  Yeah.  I lost control to the point when she first came, came at me with it.

[Pet. Ex. 1 at 13].[19]

For two reasons, the Court finds that had Cannon testified at his 1996 Trial his testimony would not have created a substantial probability of a manslaughter verdict.  First, Cannon did not offer any testimony of significance supporting any of the elements of manslaughter.  Cannon was adamantly opposed to manslaughter instructions even being presented to the jury in 1996.  [Hrg., 236, l. 8 to 237, l. 7].  Instead, Cannon wanted to rely solely on self-defense.  [Hrg., 134, l.22-24; 139, l.21 to 140, l.7].  When he testified at the Evidentiary Hearing, Cannon said little to promote the manslaughter theory.  On direct examination, Cannon said that when Clark came at him with the knife he was

---

[18]    It is clear that Cannon was "stressed out", in part, because of police efforts to recapture him after his escape from prison.  Had Cannon testified at trial, he would have risked opening door to this evidence.

[19]    Cannon's mother, Betty Scott, testified at the 1996 Trial that she believed her son "just lost it" when he killed Clark.  [Trial, 666, l.9].  However, Scott's comment has little probative value because it was not based on any first-hand knowledge of what happened on Feb. 3, 1995.  Furthermore, this testimony was not consistent with Scott's testimony that Cannon told her that Clark had tripped and fallen on the knife.  [Trial, 671 l. 9-15].

"scared."  [Hrg., 340, l. 1-2].  He was then asked if he recalled telling Det. Fultz that he had "snapped."

> A.    Yes.
>
> Q.    When did that occur?
>
> A.    When she was – what (sic) she had tried to stab me with the knife and then our diving for the knife as well.

[Hrg., 340, l. 7-10].

Cannon's testimony at the Evidentiary Hearing did little more than reiterate his statement to Det. Fultz that was played at the 1996 Trial.

Second, Cannon's credibility was destroyed during cross-examination at the Evidentiary Hearing.  The Court has outlined above in detail many instances where Cannon's testimony conflicted with his own statements or those of other witnesses.  The steady stream of inconsistencies ultimately rendered Cannon's version of what happened on February 3, 1995, not credible, and his demeanor on the witness stand was the final blow to his defense.  Had Cannon testified at his 1996 Trial, he would have undermined any effort to convince the jury that he was guilty of manslaughter, not murder.

## B.    CONCLUSIONS OF LAW[20]

This matter is before the Court on a Petition for Writ of Habeas Corpus filed by Petitioner Cannon pursuant to 28 U.S.C. § 2254.  [Dkt. No. 13].  Cannon appears through counsel and challenges his conviction and sentence in Tulsa County District

---

[20]    Any Finding of Fact which is more appropriately characterized as a Conclusion of Law is incorporated herein.

Court Case No. CF-95-727 on the ground that his attorneys at the 1996 Trial were ineffective by denying him his constitutional right to testify.

Pursuant to 28 U.S.C. § 2254(e)(1), determinations of factual issues made by a State court are presumed to be correct unless rebutted by clear and convincing evidence. *Cole v. Workman*, 2011 WL 3862143, *1 (N.D. Okla. Sept. 1, 2011).

**(1) APPLICABLE LEGAL PRINCIPLES**

A claim that a criminal defendant has been denied the right to testify is analyzed as an ineffective assistance of counsel claim, *Cannon*, 383 F.3d at 1170, and ineffective assistance claims are determined under the principles set forth in *Strickland*, 466 U.S. 668. Under *Strickland*, there are two essential elements to an ineffective assistance claim: First, Counsel's performance must have been deficient and, second, this must have prejudiced the defense. *Id.* at 687. The first prong[21] requires Cannon to show that counsel made errors that were so serious that the attorney was "not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* The Court must apply a "'*strong presumption*' that counsel's representation was within a 'wide range' of reasonable professional assistance." *Harrington v. Richter*, --U.S.--, 131 S. Ct. 770, 787 (2011) (emphasis added) (*quoting Strickland*, at 689). A defendant must overcome the presumption that under the circumstances presented, counsel's conduct "might be considered sound trial strategy." *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).

---

[21] Although denial of the right to testify is usually discussed as the first prong of the *Strickland* test, the prongs may be addressed in any order. The Court need not discuss both prongs if the petitioner makes an insufficient showing as to one. *Strickland*, 466 U.S. at 697.

The second prong of *Strickland* requires a showing that counsel's errors were so serious that Cannon was deprived of a fair trial – "a trial whose result is reliable." *Strickland*, 466 U.S. at 687.  Cannon must establish a reasonable probability that, but for counsel's errors, there would have been a different result.  *Harrington*, 131 S. Ct. at 787. The likelihood of a different result must be substantial.  It is not enough to show that the errors "had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."  *Strickland*, 466 U.S. at 693 (citations omitted); *Harrington*, 131 S. Ct. at 787-88.  Reasonable probability is a probability "sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694; *Davis v. Workman*, 695 F.3d 1060, 1071-72 (10th Cir. 2012); *Barber v. Miller*, 2012 WL 3570767, *2 (10th Cir. Aug. 21, 2012); *Black v. Workman*, 682 F.3d 880, 902-03 (10th Cir. 2012).[22]  The Sixth Amendment right to counsel

---

[22]    Petitioner, citing *United States* ex rel. *Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003), contends that a lesser standard applies with respect to his burden regarding prejudice:

> Even if the odds that the defendant would have been acquitted had he received effective representation appear to be less than fifty percent, prejudice has been established so long as the chances of acquittal are better than negligible.  *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001), *judgment modified*, 268 F.3d 485 (7th Cir. 2001).

*Id.* at 246.

   *Hampton's* articulation of the prejudice burden has been criticized.  *Eg. Helton v. State*, 907 N.E.2d 1020, 1024 n.1 (Ind. 2009) (noting: "We are not confident that this is an accurate construction of the *Strickland* prejudice standard.").  In any event, the court rejects *Hampton's* "better than negligible" standard and relies instead on the language of

is meant to ensure that a defendant "has assistance of counsel necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 691-92.

Courts are to be highly deferential in evaluating counsel's performance. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689.

In order for relief to be granted, both prongs of *Strickland* must be satisfied. Thus, failure to satisfy *either* prong is fatal to the Cannon's ineffective assistance claim.

**(2) ELEMENTS OF SELF-DEFENSE**

Cannon has asserted throughout these proceedings that his actions in killing Clark were justified by the theory of self-defense. Title 21, Oklahoma Statutes, section 733 provides:

> Homicide is also justifiable when committed by any person in either of the following cases:
>
> 1. When resisting any attempt to murder such person, or to commit any felony upon him, or upon or in any dwelling house in which such person is; or,
>
> 2. When committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress, or servant, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished; or,

---

*Strickland* and the Tenth Circuit cases cited above. *Hampton* is not the standard in this circuit; indeed, the Court has been unable to find any case in the Tenth Circuit that has adopted the *Hampton* formulation.

3. When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed; or in lawfully suppressing any riot; or in lawfully keeping and preserving the peace.

Oklahoma law provides that one is justified in the use of deadly force in self-defense:

if that person reasonably believed that use of deadly force was necessary to protect himself/herself from imminent danger of death or great bodily harm.  Self-defense is a defense although the danger to life or personal security may not have been real, if a reasonable person, in the circumstances and from the viewpoint of the defendant, would reasonably have believed that he/she was in imminent danger of death or great bodily harm.

OUJI-CR 8-46.

A defendant is not required to take the witness stand in order to assert self-defense.  *Williams v. State*, 915 P.2d 371, 376 & n.7 (Okla. Crim. App. 1996); *West v. State*, 798 P.2d 1083, 1085 (Okla. Crim. App. 1990) (self-defense may be raised by the State's own evidence); *Green v. State*, 611 P.2d 262, 266 (Okla. Crim. App. 1980).  Self-defense may be raised by the prosecution's own evidence through cross-examination of prosecution witnesses, or though circumstantial evidence.  *Williams*, 915 P.2d at 376 & n.7.  *See also*, *Cordray v. State*, 268 P.2d 316, 318-19 (Okla. Crim. App. 1954) (self-defense instruction warranted where, although defendant did not testify, there was "some evidence" victim might have been the aggressor and "brought on the difficulty").  This is what occurred at Cannon's 1996 Trial.  The theory of self-defense was raised by the prosecution's use of the taped conversation between Cannon and Det. Fultz.

The State bears the burden of proving beyond a reasonable doubt that the defendant was not acting in self-defense.  *Perez v. State*, 798 P.2d 639, 641 (Okla. Crim. App. 1990); OUJI-CR 8-49.

**(3) ADMISSIBILITY OF PRIOR CONVICTION EVIDENCE**

A major concern of Cannon's lawyers at the 1996 Trial was admission of evidence concerning his 1991 Conviction if he took the witness stand in the first stage of the trial.  The Court concludes that evidence of the 1991 Conviction and his 15-year sentence would have been admissible for impeachment purposes under Oklahoma law in effect at that time.

The version of Title 12, Oklahoma Statutes, section 2609 in effect at the time of Cannon's 1996 Trial provided in pertinent part:

1. Evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Section 2403 of this title, if the crime was punishable by death or imprisonment in excess of one (1) year pursuant to the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and

2. Evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

12 Okla. Stat. Ann. §2609(A) (emphasis added).[23]

―――――――――――

[23]   The quoted section was created by amendment in 1991.  Prior to the 1991 amendment, section 2609 provided:

A. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime:

Thus, under the Oklahoma statute in effect at the time of the 1996 Trial, evidence of prior criminal convictions was admissible against a witness for impeachment purposes; however, use of such evidence was limited.  The prior crime either had to involve dishonesty or a false statement (§2609(A)(2)) or be punishable by death or imprisonment in excess of one year (§2609(A)(1)).  Cannon's prior offense carried a sentence of more than one year in prison; thus, subject to the balancing requirement of Section 2609(A)(1), his conviction was potentially admissible for the purpose of attacking his credibility.  Whether the prior conviction could, in fact, be used for impeachment would have depended on the trial judge's decision after conducting the "special balancing test" embraced by Oklahoma's amended statute.  Whinery, *The 1991 Amendment* at 3836.

In order to determine whether Cannon's prior conviction could, in fact, be used for impeachment, pursuant to section 2609, the trial court would have had to perform a balancing test to determine whether the probative value of the prior conviction

---

1. Involved dishonesty or false statement, regardless of the punishment; or
2. Was punishable by death or imprisonment in excess of one (1) year, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the detriment of the defendant.

The 1991 amendment did three things:  (1) It resolved the ambiguous relationship between Section 2609 and Section 2403 of the Evidence Code in balancing the relevancy of a conviction for impeachment purposes against the danger of unfair prejudice in the case of witnesses other than the accused; (2) It removed the limitation that evidence of a conviction could only be elicited during cross-examination; and (3) It restructured the format of the statute to more closely resemble Rule 609 of the Federal Rules of Evidence. Leo H. Whinery, *The 1991 Amendment To The Oklahoma Evidence Code*, 62 Okla. B.J. 3833, 3836 (1991) (Hereafter, "Whinery, *The 1991 Amendment*").

evidence outweighed its prejudicial effect. *Croney v. State*, 748 P.2d 34, 37 (Okla. Crim. App. 1987). The factors to be considered in conducting this balancing test were set out in *Robinson v. State*, 743 P.2d 1088 (Okla. Crim. App. 1987) and summarized in *Gilbert v. State*, 766 P.2d 361 (Okla. Crim. App. 1988):

> To further aid the trial court in determining the admissibility of the evidence, this Court set out five guidelines: 1) the impeachment value of the prior crime; 2) the point in time of the conviction and the witness's subsequent history; 3) the similarity between the past crime and the charged crime; 4) the importance of the defendant's testimony; and 5) the centrality of the credibility issue.

*Gilbert*, 766 P.2d at 363.

It is clear that Oklahoma has not established "a *per se* rule" that bars use of a prior conviction when it is the same or a similar crime as the current charge. *Hardiman v. State*, 798 P.2d 222, 225 (Okl. Crim. App. 1990). Rather, the court must "adhere to the balancing test established in *Robinson.…* Each case must be judged on its own facts under the criteria established in *Robinson*." *Id.* Even using the *Robinson* balancing test, Oklahoma trial courts have frequently found that the probative value of prior conviction evidence outweighs prejudice to the testifying accused. *E.g., Howell v. State*, 882 P.2d 1086, 1091-92 (Okla. Crim. App. 1994) (trial court admitted evidence of the nature, not just number, of prior convictions); *Cheatham v. State*, 900 P.2d 414, 427 (Okla. Crim. App. 1995); *Williams v. State*, 915 P.2d 371, 377-78 (Okla. Crim. App. 1996). Where the court finds the prior conviction evidence more probative than prejudicial, the court is still limited in how much evidence should be admitted. The prosecutor may not go into the details of the prior convictions. *Welch v. State*, 968 P.2d 1231, 1240 (Okla. Crim.

App. 1998) (*citing Little v. State*, 154 P.2d 772 (1945) and *Britt v. State*, 721 P.2d 812, 816

(Okla. Crim. App. 1986)).  Faced with such a situation, if the defendant takes the stand,

defense counsel will often elicit prior conviction evidence on direct in order to take the

"sting" out of the prior convictions when they are used in cross-examination.  *E.g.*, *Dodd*

*v.* State, 100 P.3d 1017, 1039 (Okla. Crim. App. 2004) (Evidence of prior felony

convictions are "generally admissible" for impeachment; however, "the nature and

details of the prior offense may not be relevant, and may be unduly prejudicial.");

*Hancock v. State*, 155 P.3d 796, 813-14 (Okla. Crim. App. 2007).

Cannon's 1991 Conviction created a legitimate concern on the part of his defense

lawyers at the 1996 Trial that *some* information about the 1991 Conviction would be

heard by the jury in the guilt/innocence phase if Cannon took the stand.  The

prosecution's use of the taped conversation with Det. Fultz gave the defense a way to

argue self-defense without putting Cannon on the stand and subjecting him to cross-

examination.

### (a) *Impeachment Value of Prior Conviction*

The vast majority of jurisdictions allow the credibility of testifying defendants to

be impeached through use of prior felony convictions.  Julia T. Rickert, *Denying*

*Defendants the Benefit of a Reasonable Doubt: Federal Rule of Evidence 609 and Past Sex Crime*

*Convictions*, 100 J. Crim. L. & Criminology 213 (Winter 2010).  The underlying premise

has been described by one commentator:

> The premise of the broad impeachment rules seems to be that a person's
> general character can be determined by evidence of past criminal acts and
> that general character can be a meaningful index of propensity to lie.

Notes and Comments, *Other Crimes Evidence at Trial:  Of Balancing and Other Matters*, 70 Yale L. J. 763, 776 (April 1961).

Thus, it is widely – if not universally held -- that a prior felony conviction is relevant to a defendant's general credibility.  *See*, 1 McCormick on Evid. § 42 (6th ed.).

(b) *Time of the Conviction*

Cannon's conviction occurred in 1991 – five years before his trial for Clark's murder.  Oklahoma law generally permits use of a prior felony conviction less than 10 years old.  12 Okla. Stat. Ann. §2609(B); *Cline v. State*, 782 P.2d 399, 401 (Okla. Crim. App. 1989).  Use of the 1991 Conviction would not have been precluded by staleness.

(c) *Similarity of Offenses*

The factual circumstances of the 1991 Conviction were not so similar to the Clark homicide as to be overly prejudicial.  The two crimes both involved assault of a woman; however, Awanna Simpkins was beaten severely and left unconscious, while Clark was stabbed four times and left for dead.  The similarities are not so great that introduction of the offense for impeachment purposes would have been overly prejudicial.  Furthermore, details of the Simpkins crime would have been suppressed.  *Little v. State*, 154 P.2d 772, 776  (Okla. Crim. 1945) (Court should not allow prosecutor to go into details of prior criminal conviction).

(d) *Importance of Cannon's Testimony*

Cannon's defense to the murder charge was that he had acted in self-defense.  Since the only persons present when the killing occurred were Cannon and Clark,

48

Cannon's testimony would normally be considered critical – the only way to raise the defense.  However, in this instance Cannon was able to present his self-defense theory to the jury *without* testifying and without subjecting himself to impeachment or cross-examination.  The tape-recorded conversation between Cannon and Det. Fultz contained the essential elements of Cannon's self-defense claim.  This was critical to the trial strategy of Cannon's attorneys:  The self-defense theory could be presented without the risks associated with Cannon taking the stand.  Having observed Cannon's testimony first-hand, the Court concludes that his testimony was more of a negative for his case than a positive.

### (e) *Centrality of Credibility*

Cannon's self-defense theory rose or fell on his credibility – and the credibility of his version of what happened on February 3, 1995.  The fact that he had a prior felony conviction for assault with intent to kill would have had significant impact on the jury's perception of both Cannon's overall credibility and the truth of his version of the events leading to Clark's death.

Having balanced the five *Robinson* factors, the Court concludes that had Cannon testified in 1996 the jury would have learned (1) that he had a prior felony conviction, (2) for assault and battery with intent to kill, (3) and received a 15 year sentence.  Furthermore, Cannon might well have inadvertently opened the door to evidence concerning his escape.

The State proved beyond a reasonable doubt at the 1996 Trial that Cannon did not act in self-defense, and that the appropriate verdict was murder, not manslaughter.

49

The Court concludes, for the reasons set forth above, that Cannon's live testimony at the 1996 Trial would not have changed the verdict.

The Court concludes that the strategy and conduct of counsel at the 1996 Trial was not unreasonable based on the facts of this particular case: Cannon's self-defense claim was preserved in his taped conversation with Det. Fultz, presented in the State's case-in-chief. Furthermore, the basis of a manslaughter argument was also contained in that taped conversation. Thus, it was not necessary that Cannon take the witness stand at the 1996 Trial. Given those facts – and in light of Cannon's performance as a witness at the Evidentiary Hearing – counsel's strategy was entirely reasonable. Cannon would have only damaged his self-defense or manslaughter contentions had he testified at the 1996 Trial.

The Court concludes that Cannon has failed, as a matter of law, to meet his evidentiary obligations under *Strickland*. The Court concludes that Cannon has failed to establish that the performance of his 1996 trial counsel was deficient. He has failed to establish that counsel denied him his right to testify at that trial. In addition, the Court concludes that Cannon has failed to establish that his defense at the 1996 Trial was prejudiced by the fact that he did not take the witness stand. Based on the Findings of Fact set forth in detail above, the Court concludes that Cannon's testimony and demeanor as a witness would not have aided his defense, and, in fact, would have undermined both his claim that he acted in self-defense and the argument that the appropriate crime was manslaughter, not murder.

## CONCLUSION

Under *Strickland* it is Cannon's burden to establish both prongs of his ineffective assistance of counsel claim:  denial of the right to testify and prejudice to the defense. Cannon's effort in this regard depends chiefly on his credibility as a witness. Resolution of the Denial Prong is a matter of Cannon's credibility versus that of his attorneys at the 1996 Trial.   Resolution of the Prejudice Prong depends on the credibility of Cannon's testimony regarding Clark's death.  Based on its first-hand assessment of Cannon as a witness and its evaluation of his testimony, the Court finds Cannon not credible.  The Court's conclusion in this regard affects both the Denial Prong and the Prejudice Prong of the *Strickland* analysis.  Thus, Cannon has failed to establish entitlement to relief under 28 U.S.C. § 2254.  For the reasons detailed above, I **RECOMMEND** that Cannon's Petition for habeas corpus relief based on his allegation that he was denied the right to testify at his 1996 Trial be **DENIED**.

**DATED** this 15th day of January 2013.

Paul J. Cleary
United States Magistrate Judge

## OBJECTIONS

The District Judge assigned to this case will conduct a de novo review of the record and determine whether to adopt or revise this Report and Recommendation or whether to recommit the matter to the undersigned.  As part of his/her review of the record, the District Judge will consider the parties' written objections to this Report and Recommendation.  **A party wishing to file objections to this Report and Recommendation must do so by <u>January 29, 2013</u>.**  *See* 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b).  The failure to file written objections to this Report and Recommendation may bar the party failing to object from appealing any of the factual or legal findings in this Report and Recommendation that are accepted or adopted by the District Court. *See Moore v. United States*, 950 F.2d 656 (10th Cir. 1991); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).